of Technology, and we will begin with you, Mr. Kelley. Good morning, Your Honors. Good morning. Frederic C. Kelley on behalf of the Appellant Case of Jorjani. I've requested four minutes of rebuttal time. Granted. May it please the Court. This panel has requested all argument in favor of the case of Jorjani after the parties had opted to dispense with it. I'm therefore going to assume that this panel is possessed of unusual courage and wants to see these issues addressed in a forthright manner. And I'm therefore going to start with a fastball. Both the record, particularly at pages 326 to 333, and the briefing hearing show that there is a longstanding and legitimate debate on why the races differ in average intelligence. Government policy, however, is premised on the notion that the causes of those differences were definitively settled by environmental theories prominent in the mid-20th century. It therefore follows that we cannot subject government policy to uninhibited, robust, and rational debate unless theory is at odds with environmental theories. Mr. Kelley, we're not here to talk about the merits of the particular theories. We have before us a test that the Supreme Court has laid out for how we consider the First Amendment rights of government employees where the government has That's the Pickering test. Let me start just clarifying what we all think that test is today because you've suggested that there is a component to it that involves recklessness and malice, standards that come from theories of libel and defamation. Where is there any court that has understood that to be imported into the Pickering test? The Pickering court itself. Pickering itself explicitly cites the Sullivan Malice Standard. It's in the very holding. Thurgood Marshall wrote the Sullivan Malice Standard into Pickering, and to the extent the courts are applying Pickering without the Sullivan Malice Standard, they are misapplying Pickering. The statement that the court makes as to Pickering is, in contrast, even if this were a private citizen, not an employee, then that would be the test that applied. But has any court, other than your reading of Pickering, has the Supreme Court or any court of appeals ever imported a malice requirement into the Pickering test? Well, again, with all due respect, I believe you're mistaken. Pickering itself specifically incorporates the Sullivan Malice Standard into it. It's right there in the holding. Thurgood Marshall says we hold today, absent proof of statements made with recklessness or intentional falsity, there is no need to go into this balancing test. It seems that the Supreme – perhaps there's an insight there, and perhaps Pickering has been misconsidered. Or perhaps Pickering is due for reconsideration. All interesting points. But aren't we bound by the way the Supreme Court is applying it? And if so, shouldn't we just look to whether or not this meets the Pickering test and base our argument on that? You are bound by the way the Supreme Court applies it. And the way the Supreme Court applied it in Pickering, I think, should be the most persuasive precedent that you should follow. And I do note, and I think I'll anticipate a follow-up question from you, Judge Mady, in Conakry-Meyers, there's no reference there to the Sullivan Malice Standard. Sullivan's referenced a couple times in Judge Brennan's dissent, but he doesn't reference the Sullivan Malice Standard. But again, that – I'm sorry. No, you know, let me just pick up on this. When Pickering was decided, there hadn't been, as I read the law, a well-formed doctrine of viewpoint discrimination. It wasn't well-formed. It was something that comes later. We see it in a lot of Brennan concurrences or dissents. We see Marshall picking it up later. We see Scalia and Justice Alito. Each one of those kind of is arcs, are data points on the arc of viewpoint discrimination. But it's not well-formed at the time Pickering comes in. But Pickering, had that doctrine been in existence, involved viewpoint discrimination. Sure. Conakry-Meyers later did not involve viewpoint discrimination. It involved content-based. It was the survey that was being sent around, but not based on viewpoint. And so if we want – so I'm trying to give a little legs to your theory here to just see how it teases out. But if we want to say how can we reconcile the role of malice in Pickering and its absence in Conakry-Meyers, one thought would be, well, viewpoint discrimination gets the highest degree of protection. Hence, what happens in a viewpoint case is different than what happens in a standard content-based case where that wasn't as prominent in Conakry-Meyers. What do you say to that? I think that's true, and that builds on a point I'd like to make. The speech in Conakry-Meyers was different. The quality and the nature of it was completely different than the speech in Pickering. Harriet Meyers was circulating a questionnaire. She wasn't making statements. Therefore, the Supreme Court had no occasion to revisit its use of the Sullivan-Mallis standard in Conakry-Meyers. But you have that here. You have statements here that clearly do not meet the test under Sullivan-Mallis, and they are used to effect – and they are used in, I think, NJT abused – well, it's a total lack of license – to impose viewpoint discrimination. The speech at issue here is certainly not insult, but it was the mere content of it, the fact that it upset so many people, that NJT stood on to retaliate against my client. And to go back to – I mean, I'll go wherever the panel wants to go. But the point I was trying to make at the very beginning of this was not that you should decide one way or the other. I don't think anyone should decide the question of racial intelligence one way or the other as a matter of law. But the way we decide matters. The process by which we debate things is through opposing premises. It therefore follows that unless we can air premises opposed to environmentalism without the sanction of retaliation by the state, the First Amendment is being abused. But there are limits to that, particularly where the government is acting as here, as an employer, and not simply as the sovereign issuing some sort of prior restraint of the regular public. And so we're asked to balance the interests that you've put forward with the interests of the university. And do you agree that coming out of Pickering and Connick that we need to do that on a sliding scale, where we do need to take account of – assuming here, as we must, the parties have stipulated that this involves a matter of public concern, that there is a different weight to be given that public concern depending on what subject matter it is addressing, and that that's proportional to the burden that must be shown by the university? With due respect, I don't quite agree with that formulation. And again, I think the Third Circuit, and many other circuits for that matter, the Ninth as well, appears to be doing something other than Pickering balancing as set forth by the Supreme Court. And Connick v. Myers, I think at – I'll give you the exact site in one minute – at 145, simply says speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection. So this little dance, I think, that the courts like to do, by which effectively the government has snuck in the old bad tendency test of speech that Chaffee and Holmes and Brandeis tried doing away with in the 1920s, I think they've snuck that in in Pickering balancing. I don't think the Supreme Court has sanctioned that. Well, Connick itself says that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. And we, in our opinions, like Monroe, have taken that to understand we must apply a sliding scale where the amount of disruption an employer has to show is proportional to the importance of disputed speech. Okay. Aren't we bound by Monroe? Well, you're more bound, I think, by Connick v. Myers, actually. And again, the issue there is that speech is on a public issue, and therefore it's entitled to special protection. It's protected there if it's on a public issue. But even assuming, I think, that there is a sliding scale that the courts are using, you have to look at the nature of the institution. The disruption here would not have sufficed to disrupt a middle school or trans-Union 85 because mere disagreements and debate are something that is supposed to occur at a university. So help me understand this. Is your argument, assuming we're applying this Pickering scale, is your argument that the speech at issue here is exceptionally high in value or that the disruption that NJIT is pointing to is exceptionally low? It's both, Your Honor. It's both. The speech here is exceptionally high. It carries the seeds in, I think, a very powerful critique of sacrosanct government policy. Something they say, well, but there was disruption to the educational mission, I believe. There was disruption to the administration of the university in terms of staff focus, and there was disruption among faculty in terms of their ability to deal with one of their colleagues. I think those are their three points. What do you say to this? Disruption that couldn't have been answered with a simple e-mail, defending Rajani's right to engage in extramural speech. This disruption here is not worthy of a university. The question should be, gee whiz, do we have the ability to debate this? Is some kind of disaster going to befall us before we can debate this? If not, the disruption here, electronic communications, less than 50 in number, is going to disrupt the university? That speaks very ill of our universities. Take your point about the simple motive reaction and answering criticism or objections. But what do you say, particularly in a university setting where there is an interest on the part of institutions of higher learning to protect the environment for students to be able to learn, that the interests of students also need to be considered? And in particular, in Monroe, we had said that the First Amendment doesn't require a public employer to sit idly by while its officers make racial insults against those they are hired to serve. Can your argument be construed to mean that you're asking us to say that the First Amendment does require a public university or college to sit idly by while professors make racial insults against those they're hired to teach? Not in this, I do not bring you Cohen's jacket. I do not bring you the Westboro Baptists. If you look at Dr. Johnny's speech, particularly his essay from 662 to 670 in 4748, it is not even remotely insult. Frankly, I mean, I can't go back and rewrite history or First Amendment jurisprudence, but I don't believe Cohen v. California or Snider v. Phelps are properly decided. I think Judge Alito was the only one who got Snider v. Phelps correct. I am not remotely trying to debase the First Amendment by mere insult. But if you spend just five minutes with the essay at 662 to 670, it is clear it's not insult. It's not that it has some saving intellectual content. It is all intellectual content. It's an appeal to reason. The fact that it has alleged findings that people find inflammatory. Well, you know what? Students have an interest in being exposed to ideas that are disquieting. None of this was happening in a classroom, correct, or even on campus? None of it. None of it. I mean, in the record, there's one email that says, well, Dr. Johnny kind of mentioned this stuff about Iran being a cognitive variance and this and that. But in fact, his black students loved him. I came back, offered the most, I think, the most compelling First Amendment justification for protecting for Johnny, one that was disregarded in whole by the administration. It was the administration and the faculty in their intolerance who want the sanctions or Johnny, not his students. That's what the record shows. But even saying some students were disrupted or they found the notion that he had these private views or off-campus views unsettling. The whole purpose of a university is to expose people to ideas they may not agree with. That's how we mature as people. So in terms of disruption and in terms of relief, just correct me if I'm wrong, but your client's not requesting injunctive relief. He's not requesting reappointment or renewal of his employment contract. He just wants damages. Is that right? Of course, the question of relief. Did you plead? I didn't see it. No, damages is what we requested. And so if you only want damages, just in terms of disruption, it feels that even if we posit that your client might be very, very, very disruptive, if he doesn't want to come back. Yeah, exactly right. But even if we say that, if he doesn't want to come back and he just wants to get paid, doesn't that kind of suggest that the degree of disruption is less since he's not going to be on campus anymore? And does that, should that weigh into the balancing at all if you say, wait, you know, when we want to talk about what happened to me, you have the opportunity. Maybe you can let me go. I don't want to come back. I just want to get paid. Does that alter kind of the nature of disruption since it seems that he's willing to kind of end the relationship or tolerate the end of the relationship as long as he's compensated in his view appropriately?  I must say, I think, just thinking, thinking legally I think disruption has got to be judged by what occurs at the time in question. So I'm not sure the question of damage really enters into it. There may be various pathways which can go to separate ways and everyone would be happy, but that's not an issue I think that's. So I guess what I'm saying is if you requested injunctive relief, if your client requested injunctive relief and wanted to come back, maybe concerns about disruption would be larger than they are if you only seek damages. That's another way of putting my question. Do you think that's true or do you think that it's still we're only looking at it at the time period at which the termination decision took place? In all honesty, I think we're still looking at the – I hate to speak of even disruption. I think it's so far out there. I know. You've got to work with me though, but yeah. I know. I think fundamentally it's – there is a fundamental objection to saying that ideas alone, regardless of their manner and their context and content, are disruptive at a university. I really haven't considered your point that I think I – that I want to answer. Okay. I see my time has expired. If there's nothing else, I'll sit down and wait for rebuttal. Thank you. Good morning, Your Honors. Mark D. Havener, Walsh-Pizzi O'Reilly on behalf of defendants, New Jersey Institute of Technology at all. May it please the Court. So New Jersey Institute of Technology is a public university created by the people of New Jersey to provide engineering and technical education to any and all qualified high school seniors and members of the public who seek a science-based education. Appellant, Mr. Giorgiani, Dr. Giorgiani, was a year-to-year lecturer in philosophy and history. He had a contract with NJIT that was limited to teaching class. What relevance does that have to our Pickering analysis? I think it has relevance to the Pickering analysis, Your Honor. It more goes to this second question, whether there are other permissible grounds for the termination of Giorgiani or his non-renewal. Excuse me. But the district court didn't reach that. District court did not reach it. Looking at the question of the balancing of interests. Certainly, Your Honor. I think here you see Giorgiani is put on paid leave and then his year-to-year contract is not renewed. He appears in the video in the New York Times extolling Hitler as a great European leader. He published this philosophy think piece that recommended the use of eugenics in order to purge non-Aryan blood from Persians. Dr. Giorgiani has determined our Aryans. And he recommends this specifically for the purpose of bringing Iran back to greatness that it had in the 800s, 900s. And so this speech, espousing Hitler, espousing the use of genetic engineering for political purposes, this is all very disruptive. And it wasn't. So it's your argument to say the question that I asked your friend. Is it that the speech in your view is so low or the disruption is so high that justifies that it eliminates any concern under Pickering? Well, I think I would tell Your Honor, honestly, it's the middle ground for both. The speech is a matter of public concern, as we argue. It's not the lowest level of public concern. It is not a joke, which was the concern in Feneco that some of these jokes could be disassociated from anything other than some sort of racist jab and not really point to any real insight. And the Third Circuit said that. How are we supposed to weigh that?  I hear you agreeing that he has some personal interest. You agree this is purely extramural speech. You agree that it is not without public interest. It touches upon issues of public discussion and import. So that all sounds like what we really then need to shift over to the burden on the university for accommodating this extramural speech. So tell me why the disruptions you cited, which, again, I think are values, intercollegial relationships, and the administrative burden that befell the staff. Why is that enough? And I'll kind of just pimp with you a little more. Why isn't that just sort of the operation of a normal university whose entire product is ideas? That's the only thing you're selling is debate and discourse about ideas of all sorts of merit. Why isn't this just the kind of thing that happens at universities all the time? So just to back up a second, I would not say that this is entitled to the highest levels of public concern. It is a sliding scale. My argument is this is not at the lowest level. It is certainly not at the highest level that we see in these cases where we recognize that campaigning or whistleblowing is entitled to the greatest level of protection because that goes to the government. You still have to show some disruption, though, so let's focus on that for a moment. Certainly. So there were student complaints, and we see that at JA 518. We see it at JA 283. One of those students had dropped the class because of these events. We see the student at SA 34 where the student recounts dropping the class previously because they looked up Dr. Giorgiani online and were troubled by what they saw, and in class they were determining who was white and who was not. It feels like a heckler's veto, a little bit like a heckler's veto, right? I'm not so sure, Your Honor. The question is, you know, heckler's veto, I understand to be about people who are not impacted directly by the relationship, who are not directly at the site. Here, these are students, just like in Monroe, who have a college, though, right? Do you think there's a distinction between the educational settings there? I think it is a distinction with the difference, Your Honor. But they're still students. They are the people who have to interact with Giorgiani. They're not hecklers. Hold on, counsel. There are some students who said, I don't find this to be great, and there's one who dropped out. I mean, so far, again, this is the ordinary day in the life of a university. Students don't like what they're hearing, and one floated with their feet and decided to drop the class. I mean, tell me more about how this was a significant disruption. Certainly, Your Honor. As Your Honor has already identified, there are these students who dropped out. There's two at SA34 and JA283. Also, though, we have these testimony from Giorgiani himself provided to the newspaper where he said the students were gut-punched after the New York Times article came out. So, I mean, he saw the change in the relationship between him and the students. He is there in a position of trust. He is there to teach courses on history. He's not there to teach courses on human genetics and biology. He has these opinions about human genetics and biology. He has these opinions about where Hitler ought to be ranked in great European leaders. It still sounds like, to Judge Phipps's point, though, what you're describing is a minority reaction. Subtle. Students appearing to be unsettled by an idea. One, maybe two, deciding to take a different course. But that does not sound like a substantial disruption. Even a disruption is the problem. And so that's why I was trying to focus in on, if you're resting on disruption, then don't you have to show more, particularly in the setting of higher education, than mere exposure to ideas that may be unpalatable or, frankly, just wrong? You know, Your Honor, I think context does matter at every level in this Pickering balancing test. And a university is not a high school. But it's still the case that the university has an interest in fostering a collegial educational environment, you know, and while doing everything within its powers to maintain its reputation in the academic community, both on campus and around the world. We see that that's from Trejo versus Chauvin, the Ninth Circuit, Seventh Circuit case. You know, it's interesting to me about this notion of disruption because I don't think the university can always terminate whoever they want. You just have to pay them. And so why isn't the answer, yeah, you know what, we decided we didn't like what he said. We didn't like the viewpoints he espoused. We terminated him. We're free to do that. And now we have to pay him. I mean, like it seems what the university wants to do is say we don't like your viewpoints. And now we want to get rid of you without paying. It strikes me that whatever he's owed, whatever, however you value damages, maybe his annual pay discounted for present value determined by add some benefits into all that stuff. That's the decision that the university has to make. They say if we want to fire you based on viewpoint, we have to look at the disruption to the university. We have to weigh what we're going to owe you. And maybe sometimes the answer is, hey, we're just going to cut you a check. Why is it that you want to get out of paying if you fire him based on his viewpoints? Don't you owe him a check? I mean, the answer isn't retain him. I get if you retain him, you could say, oh, there's continuing disruption and that's a real problem. Oh, yeah, you buy yourself out with a check. Why isn't that the answer? That's all he asks for. He asks his counsel. That's all he wants is a check. He doesn't want to go back and teach there. You want to fire him based on his viewpoints? Pay him. He doesn't come back. Your disruption is gone. That feels like a very kind of you hate to commoditize free speech. But sooner or later, it comes down to that. Why isn't that just all the disruption goes away? It has a price tag on it, and it's some multiplier of what you paid him for a few years probably. Well, it's not so clear to me that you need to commoditize the free speech. Cases are replete with people being disciplined, fired, sanctioned for their speech. Even at universities, no one is required to pay them at all. So if we're on the right side of the balancing test, then we're entitled to not renew this year-to-year contract. But you have no expectation of renewal. We have no right to renewal of this contract in the first place. So if he has no right to renew a year-to-year contract, determination is made that he is more trouble than he is worth because of the disruption, because of missing class, because of all these other things, then we don't owe him anything because we are acting within our rights as an employer pursuant to the relevant First Amendment test. The judge didn't come up with a simple failure to renew. He was suspended pending investigation and then was not rehired. Correct. He was suspended with pay. So this goes to Judge Phipps's point, of course. He's not out any money when he is suspended with pay. And that suspension was twofold. One, it was a concern about the disruption. Alumni, taxpayers, politicians, they are writing, they are calling, they are concerned about Giorgiani's presence in association with the university. You know, in the record, in the article against perennial philosophy, the end of that, the blurb describes Giorgiani as a full-time faculty member. We're talking here about a professor who has spoken in his capacity as a private citizen. Yes, Your Honor. Notwithstanding that he identified himself as a professor in the article, but you've stipulated that he was speaking as a private citizen. Yes, Your Honor. So where do we draw the line if what you've put forward here as disruption, that is that there's negative reaction, there's criticism, there's people writing letters, disagreement with their views in contrast to his, and some students who opt not to take a class. If that's enough to terminate someone, then where do we draw the line on anyone who speaks up with an unpopular view or takes a position politically in their private capacity with which students or other faculty disagree? Is that enough to take employment action against someone? Well, I mean, it would depend, because of the contextual nature of the test, it would really depend on their speech, its context, what it specifically was. I mean, if it's true political speech about politics in the United States, going to who to campaign for, who to vote for, in a private setting, that would be a very high burden to meet for disruption because that is the highest level of speech entitled to protection under the First Amendment because it goes to the very nature of American self-government. Here, we don't have that, though. What we have in this context is a man who has an opinion about Hitler that he shares, and it ends up in The New York Times. I mean, that's a very real thing, and people can have a very real reaction to Georgiani's endorsement of Hitler as a great European leader who should be on bank notes. But, you know, it gets really interesting to me because your entire argument centers, it resonates around viewpoint. It's an unpopular viewpoint. And when Pickering was decided, I asked this line of questions to your friend, we didn't have solid viewpoint discrimination cases. I mean, Rosenberger comes out in like the mid-'90s, and it basically says, hey, it might be per se illegal to discriminate based on viewpoint. We have RAV a few years beforehand that says even for unprotected speech, if you're punishing unprotected speech worse based on viewpoint, that's a problem. And so when we want to do this balancing, doesn't it really matter that we have a lot of new Supreme Court, or at least it wasn't around when Pickering was around, that basically says, when you want to do this on viewpoint, we've got a different game. I mean, it is close to, you know, it's certainly strict scrutiny, and it's close to a per se rule that viewpoint discrimination is very, very bad. Doesn't that really begin to change the balance in terms of how we want to look at things? If we're going to say public employers, though, under Pickering, if everything aligns can engage in viewpoint discrimination when the Supreme Court in every other context has said, absolutely not, don't even think about it. There's a public employer exception for viewpoint discrimination. Well, I would say, Your Honor, first viewpoint discrimination, it was not pled below as the district court noted in the footnote. Leaving that aside, though, it's not clear to me that anyone is engaging in viewpoint discrimination. They are engaging in a reaction to disruption. The underlying basis for that disruption, whether you agree with it or disagree with it, I don't see where that is in the record. Dean Belfield says, I don't personally agree with him. You know, Provost Deak says, I don't think that's good science. But all of the disruption arguments are tied to the viewpoint espoused, right? Isn't that every case, Your Honor, that people's reaction? It's not conic. Well, conic is, you know, the survey question. It's a little different. Well, I mean, Monroe, Your Honor, it's viewpoint discrimination in that the teacher, this English teacher is saying these kids are lazy and stupid. I mean, that's a viewpoint. Other people, I'm sure, agreed who have had teenagers. Oh, yeah, those are the teenagers I know. Other people say this is crazy. But the disruption is what it is. Getting back to the disruption, don't we need something concrete? We can't have just speculation about the disruption. And what we have in this record is just about the sort of immediate aftermath. Don't we need to have more specifics about why this posed a long-term, substantial burden on the university? You know, I think you have that here. You have actual disruption. You have students looking gut-punched. You have students dropping the class. You have people complaining. And not hecklers, not just random people. You have actual alumni, actual parents complaining about what's going on. Was the cause of that the speech, or was it the university's reaction to the speech? Because this wasn't clear to me from the record. There is a video that is made under cover, which is then referenced in a newspaper article. The next day, the university puts out a statement, denouncing the statements as antithetical to the core values. And then there's a series of follow-on letters. I mean, that obviously, I'm assuming you're not pointing to that as disruption, because that's the university's own choice to put those statements out. And so we're not looking at any of that, right? No, I wouldn't say, Your Honor. I think the disruption, we see disruption akin to the disruption in Roseman, or what's identified as what could constitute disruption in Roseman, namely this conflict between the faculty member and her chair, where she accuses him of dishonesty. You see Giorgiani here threatened to sue his colleagues for defamation. But this is all after the statements go out from the university and the statements go out from the department, which, again, you and JIT choose to take on. So I'm assuming you can't point to your own actions as disruption. No, I don't think so. Okay. Yeah, I think— So then it's what we're talking about then is the 50-odd emails and a student withdrawing. Well, I think these faculty people are acting on their own behalf. So the biology department, federated history department, the faculty senate, these are not— I mean, they're associated with the university. Their statements don't have the imprimatur of the university. And, in fact, the record reflects the university said sign this yourself. Like it's not coming from us. And that conflict between these faculty members with the threat of suing them, you know, this is what happens in this Hayden versus executive residence at the White House, where the plaintiff is constantly threatening to sue his colleagues. And if it's not EEOC, the federal circuit says, I mean, that's pretty disruptive. So here we have that in the record. So we have actual disruption at whatever level. I would suggest to you it is more than sufficient. But having actual disruption certainly permits the argument that we can now act to avoid future disruption. So it's not just mere speculation that if we don't do something, it's going to get worse. It's actual reasonable inference based on how bad things are today. But you're not asking us on the basis of this record to move forward with the next step of the analysis, right? That would require a remand for the district court to consider alternative grounds for the action that was taken. We're reviewing the district court's balancing of the university's and the professor's interests. I would not be so bold as to suggest your honors undertake original jurisdiction of the second half of the test. If you wanted to, I certainly wouldn't complain. But I do think remand is probably the appropriate step. If we disagree with what you've put forward as far as balancing. Correct, Your Honor. It's really interesting to me, this notion of disruption. You know, Pickerington has decided, let's say, 68. And then after that, the year after it, you have Tinker, which is 69. Now, Tinker goes a different way. It's student speech. It's on campus. It's all this other stuff. But what you were saying, the interesting thing about Tinker is Tinker talks about the ability to forecast future disruptions and the use of future. It might not be a problem now, but we want to look into the future. And a little bit of what you were saying in response to, I think, some of the earlier questions said, hey, we want to do some forecasting too. And so it struck me that the case I know most about forecasting is Tinker. But when we want to talk about the things that Tinker says, it says, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities and no disturbances or disorders on the school premises, in fact, occurred. But it seems that they're really talking about disturbances and disorders on school premises, like taking over the student union at a university or something like this. And so these cases are decided a year apart. They're both talking about disruption. So when we see disruption and we want to forecast for disruption, why isn't the threshold something much more like not just we got a bunch of emails, but the students are going to take over the library or they're going to take over the president's office or they're going to take over something like that, as opposed to it was a bit of a hassle from a PR standpoint? So I mean, I think Rossman versus Indiana University of Pennsylvania, the Third Circuit opinion from 1975, it suggests that the disruption just between the faculty member and her chair is a sufficient evidence of possible future disruption. I'm not going to tell you this isn't dicta because it is, but I think the Third Circuit has already recognized that it's possible to forecast disruption and that disruption, even at the college level, not be arson or taking over the student union. And here we do see the very real possibility, just common sense tells us, that if you take Georgiani's class and you're not fully Aryan and you don't like your grade at the end, you should appeal that grade and you should point to the fact, well, he already thinks I can't do philosophy, here's the article. So are we going to end up with proctors to regrade papers? These are things that have happened in these cases where the courts are just like, there's a point at which too much is too much. And we don't have to wait for that other shoe to drop to make a decision. Thank you. So, my friend there on the other side likes to stand on this statement. I think it's an essay three about students being gut punched. But that statement comes out after the administration has already begun chumming the waters in targeted Georgiani, there is no substantial showing in the record. That's simply because of Georgiani's speech. It could very well have been that his students felt gut punched, the way obviously McKay and Mac did, you can see his words at page four, three to four or five, by the fact that a teacher they loved was being targeted in a manifestly unlawful way. So, there is no substantial showing of disruption on the part of the students. That's simply not in the record. Mr. Kelly, your colleague has argued as a common sense matter when we're thinking about the disruption that is currently in the future, post the university, that it affects the way students would experience the class, choose to take the class, have issues appealing their grades. This is extramural speech. He's speaking as a private citizen. And you've argued that it wasn't directed at anyone at the university. But his statement was that Asians, Arabs, Africans and other non-Aryans lack a genetic basis for the highest philosophical thought. And he is teaching philosophy to those students. So, why isn't your colleague right that for students who fall in those categories, that it's on its face clear that it would cause disruption to their matriculation of the class and their ability to be treated fairly in that class? Because if that's the standard then, and let's take Giordani's words for what they are, let's read them strictly, then every student in NJT is going to have the ability to complain about Giordani regardless of their race or anything else. Because he didn't just say that Arabs and Asians and Africans don't have the ability for philosophical insight. He said that philosophical insight, the kind of man that is a Nietzsche or a Hegel, is one in a million. Now, that does not mean, that clearly means that pretty much the vast majority of students in his class are not capable of the highest philosophical insights. And frankly, that's probably true. It would have been presumptuous, I think, of any undergraduate to think, gee whiz, here I am in my freshman, sophomore year and I'm at the level of a Nietzsche or Heidegger. The notion that that itself is going to be a rational ground to fire Giordani is, I think, preposterous because the standard Giordani is speaking of there in his essay at 662 to 670 is the kind of philosophical insight that is extremely rare to begin with. Let alone, I mean, it's not the gee whiz, all the whites have the ability to do philosophy and all the brown people don't. That's not what he's saying. He's saying virtually no one has the ability to do this. In fact, it only comes through generations of tension and certain developments. But he does seem to be saying that the only ones, and maybe it's one in a million, but the only ones who would be able to achieve that are Aryan. So what does that communicate for students who want to study philosophy and are presented with the only option of taking his class? Well, first of all, there's no evidence that the only option to take his class was Giordani. But second of all, you have to then, I think, get over the — first of all, it's a statement out there that begs for dispute. If people think that's not true, then they are free to go out and say, actually, Confucius and Lao Tzu and these other ones, they really are, contrary to Giordani, profound in philosophy. And frankly, academics have those kinds of debates all the time. That should be debated freely. But beyond that, I think the notion that a student should think himself capable of the most profound philosophical insights, any student, is — it reflects a lack of humility on the part of a student. I mean any student should think that he's there to learn. The problem for you is we've got this Monroe case that seems to suggest that when you start insulting students, we start to get disruption. And so, you know, we have at least a little data in the record that some students took offense at his statement. And so what do you say to Monroe, which is you can't — you know, you start insulting students, you start to get disruptive. I say that Monroe was distinguishable on several grounds, and it's not an insult. It is — I mean, and I won't stand on — again, I'm not going to stand on Cohen. I'm not going to stand on Snyder. Give me Treplinsky. Give me Cantwell. An insult is a narrowly limited and narrowly defined and limited class of speech. If I'm talking about — and I hate to use the words, but if I'm calling my students assholes or lazy, that's an insult, right? If I'm giving someone an exposition of ideas, whether they find those ideas insulting or not, that is not an insult. If someone reads insults into that, they're bringing their own values to that, and they're simply trying to resist an idea. But here it's also the person who would be grading their papers and making recommendations for them. Okay. And if I'm a Catholic — Doesn't that make a difference? If I'm a Catholic, do I say I want to study the Renaissance but don't tell me what the Borgia Popes because it offends my piety? If I'm a Baptist, do I say gee whiz, I find it offensive that this teacher thinks we're descended from apes? Does that work? If I'm a Protestant, do I say gee whiz, I want to study the Reformation but don't tell me that Luther's odd fixation on scatology? Or I'm going to take theology, but I know my theology professor's an atheist. Where do we draw the line? You asked where we're going to draw the line earlier to my friend there on the other side. The answer is under the district court's decision, nowhere. There is no line. We have a roving commission to ferret out speech anywhere and everywhere. Trudeau didn't make a speech for the New York Times. He had a two-hour conversation with some guy undercover. If that kind of speech is not protected, no speeches. Thank you, Your Honor. We understand the argument, and we appreciate the briefing and oral argument of both counsel. We will take this case under advisement, and we will adjourn for the day. Thank you, Your Honor. This court stands adjourned. Thank you.